**STATE, Plaintiff-Appellee, v. McKINNEY, Defendant-Appellant.**

Ohio Appeals, Seventh District, Mahoning County.

No. 3272.   Decided March 21, 1949.

William A. Ambrose, Pros. Atty., H. H. Hull, Asst. Pros. Atty., Youngstown, for plaintiff-appellee.

W. M. Howard, J. Maynard Dickerson, Youngstown, for defendant-appellant.

JACKSON, J, of the Third District sitting by assignment in the Seventh District.

## OPINION

By PHILLIPS, J.

A jury in the court of common pleas of Mahoning County found defendant guilty of murder in the second degree (see §13448-2 GC), and acting under §12403 GC, the trial judge sentenced him to be imprisoned and confined in the Penitentiary at Columbus, Ohio, during life.   Defendant appealed

from that judgment of conviction and imprisonment to us on questions of law.

Robert L. McKinney, appellant here, was defendant in the court of common pleas. The parties will be referred to in this opinion as they stood in the court of common pleas, the appellee State of Ohio as the State, and appellant McKinney as defendant.

Defendant, together with others named in the indictment, was indicted by the grand jury of Mahoning County in the first degree for the murder of Cyril L. Runk upon the following indictment laid under §12400 GC:—

"Indictment for First Degree Murder
(Felony)
The State of Ohio, Mahoning County, SS.

"In the court of Common Pleas, Mahoning County, Ohio, of the Term of May in the year of our Lord one thousand nine hundred and forty eight.

"The Jurors of the Grand Jury of the County of Mahoning and State of Ohio, then and there duly empaneled, sworn and charged to inquire of and present all offenses whatever committed within the limits of said county, on their said oaths, in the name and by the authority of the State of Ohio, do find and present:

"That Robert L. McKinney, Thomas Williams, George Williams, Howard Harris, James Wesley Hardret and John Williams late of said County, on the 22nd day of April in the year of our Lord one thousand nine hundred and forty-eight, at the County of Mahoning aforesaid did jointly, unlawfully, purposely and while attempting to perpetrate a robbery, kill Cyril L. Runk, contrary to the statutes in such cases made and provided and against the peace of the State of Ohio."

Upon this indictment the case we review went to trial before a jury in the court of common pleas and was submitted to the jury upon a charge of first degree murder, second degree murder, first degree manslaughter, assault with intent to rob, assault and battery and acquittal, and resulted as stated.

About 1:30 o'clock on the morning of April 22, 1948, Cyril L. Runk, a locomotive engineer, reference to whom hereafter will be made as Runk, and Lola Harrison Early, likewise a locomotive engineer, were walking in an easterly direction on the southerly sidewalk of Arlington Street in the City of Youngstown, Mahoning County, Ohio, and as they approached a residence situated thereon known for street numbering

purposes as number 271 Arlington Street they met defendant and those indicted with him and others, who were walking in a westerly direction thereon, and to permit them to pass unmolested Runk and Early left the sidewalk and Runk walked behind Early on the lawn on the property side thereof.

Defendant testified that he and Thomas Williams left a dance hall, where the group of which he was a member had spent the evening, and were walking in a westerly direction on Arlington Street; that Hardret, Harris, John Williams, George Williams and Hopson preceded them, and as they approached a driveway situated between the second and third houses on the south side of Arlington Street he noticed "a fight", and that one of the two men who were approaching them ran past him, and that he walked around the fighters and stood on the sidewalk west of them and watched the fight, and that when it was over the other boys caught up with him and he told them they should not have molested Runk. The evidence discloses that he owned an honorable discharge from the armed services, had a good service record, and had accumulated a savings account of $300.00.

Defendant's statement, State's Exhibit 4, introduced in evidence reads as follows:—

"I, Robert Lee McKinney, age 26, 1215 Central Avenue, give the following statement to Officers Clyde Reid and Ted O'Connor of my own free will, voluntarily, without any threats or promises. I have been advised that I may have the service of an attorney, if so desired. This may be used in Court.

"On April 21, 1948, I attended a dance at the Nu Elms Ballroom. I left the dance at about 1:30 a. m., April 22, 1948, walked south on Elm Street to Arlington Street, west on Arlington on south side of the street, in company with Thomas Williams, alias 'Tony', Arthur Hopson, alias 'Sonny Man', Howard Harris, alias 'Sooner', James Hardret, alias 'Smokey', John Williams, George Williams, alias 'Georgia Boy.' I was walking with Thomas Williams, alias 'Tony'. Arthur Hopson, alias 'Sonny Man' was walking a little ahead of us. Howard Harris, alias 'Sooner' and George Williams, alias 'Georgia Boy', James Hardret, alias 'Smokey' and John Williams were walking in a bunch ahead of 'Sonny Man.' As we came to a point near Fifth Avenue, I noticed two white men walking east on Arlington Street towards us. They met the bunch ahead of me, and a fight started. I don't know what started it. I saw Howard Harris hit the man. I saw George Williams hit the man. At that, one man broke loose and ran past me. I walked around the bunch that were fighting. I did not

see the man knocked down. I walked on, on the same side of the street. Arthur Hopson, 'Sonny Man', walked out in the street and towards the other side of the street. I crossed Fifth Avenue and when past Fifth Avenue, Arthur Hopson joined me, and then the other boys ran and caught up with us. Howard Harris, alias 'Sooner' and Thomas Williams, alias 'Tony,' were the last ones to catch up with us. While this fight was going on, I heard some bad language, such words as: * * * and 'Bitch'. I don't know who was using this language. After the boys caught up with us, I told them they shouldn't have done that. We all went to Bill Robinson's. I knew it was wrong to beat up these men. I heard about the man dying on Saturday, April 24, 1948. I figured it was the same man whom the boys had fought with. I left Bill Robinson's with Bennie Cobbs, Thomas Williams and Sammy Stevenson, and went down to the Rainbow Lunch. I went in and called a cab, did not get any answer. One of the boys knocked on the window and said, 'Here is a cab'. When we got in the cab going to Campbell, Ohio, there was a lady in the cab when we got it. The lady got off on Poland Avenue, and we went to Campbell, Ohio. We all paid for the cab. This is the truth to the best of my knowledge. I have read the above two pages and had it read to me.

Signed,

Robert Lee McKinney

(Written by Det. Ted O'Connor, April 29, 1948, Question Room, Fourth Floor, City Jail)"

Testifying in his own defense defendant denied that he struck Runk.

A resident of 271 Arlington Street, an eyewitness to "the fight from beginning to end," testified that as Runk and Early passed defendant's group Runk was "elbowed," "shouldered" by one of the group; that he heard a cry "what do you want the whole damm sidewalk?" and almost immediately Runk, testimony concerning whom was that he was a peaceful man, was knocked down by one of defendant's group, picked up, knocked down a second time, kicked and stamped upon by some members of the group, again lifted up and brushed off as if they were feeling his pockets and then thrown down near a fir tree at the west side of the lot directly east of his residence, where he found him lying in a stupor and moaning near a spot of blood 4 or 5 inches in diameter; that he saw two men stoop down over him, one of whom apparently "riffled" or "searched his shirt," and vest pockets; that before the arrival of the police, whom he sum-

moned, two men came along lifted Runk up and took him east on Arlington Street.

Runk (who "came to his death by homicide") died later that day from shock and hemorrhage due to bilateral fractures of the skull and other injuries resulting from such attack, which injuries the coronor testified would take terrific force to produce.

One of the police officers, who was called to the scene of the fight and found a knife and keepsake coin at the place where Runk was lying, testified that Runk and Early told him no one had or had attempted to rob them.

Runk's companion Early, who was only able to identify McKinney, verified the testimony of other witnesses as to what happened, as described supra, and the almost unidentifiable condition of Runk's badly swollen, battered and bruised face as testified to by some witnesses, and testified that he walked around defendant's group as he met it; that as he turned around he saw one member of the group knock Runk down and kick him; that he walked back and all of them were kicking Runk, requested the group not to strike nor kick Runk further, "for God's sake boys don't do this I will take care of him," and then the group kicked him and knocked him down; that Runk's face was "turned sideways and his mouth was twisted."

Harris, indicted but permitted to plead to a charge of manslaughter, generally testified, as did other witnesses, as to what happened, placed the position of the members of the group a little differently than other witnesses placed them as they walked along; and verified the testimony of other witnesses that Runk was "elbowed" by McKinney, who kicked him in the head four or five times (to whom he was doing nothing) as he passed the group walking in the grass, and that he (Harris) struck Runk as he was shoved or whirled around into him, who was struck then by George Williams, Thomas Williams, other members of the group and defendant; that Thomas Williams picked Runk up and "brushed him off in front," "frisked him in front."

Witness Good testified that he loaned Runk $25.00 at five minutes past one o'clock on the morning of April 22, 1948, giving the money to him in two ten dollar bills and one five dollar bill, and witnesses Tinkler and Capuano, nurses who searched Runk in the emergency room at the hospital, did not find the money.

Briefly but substantially such is the evidence upon which we are urged to conclude that the trial judge erred to the "prejudice of defendant in overruling the motion for a directed verdict of acquittal as charged in the indictment at

the close of all the evidence; in overruling the motion of the defendant at the close of all the evidence to reduce the charge from first degree murder to first degree manslaughter, and to submit that to the jury plus lesser included offenses; in overruling defendant-appellant's motion for a new trial; and in entering sentence of judgment upon the verdict"; and because "the verdict is contrary to the manifest weight of the evidence" and "to law"; and for "errors manifest of record in the trial of this cause"; and on the ground of prejudicial misconduct of counsel for the state, disposition of all of which will be made later.

Counsel for defendant contend that "throughout this entire trial the conduct of the prosecutor was prejudicially erroneous," and contend "the prosecutor (R. 297-298) went outside the record to incite class hatred." On those pages it is reported that in argument to the jury counsel for the state said, and in oral argument counsel for defendant states is what he refers to, that:—

"Well, my answer to that it must be found in your experience in life and in mine; the answer to that that it is a symptom, it is a sign that has become more and more apparent wherever the public generally gathers. If you will think back and think hard, perhaps not so hard, you will know that you have noticed that symptom of that sign in indignaties that have been practiced but this is the culminating act. Now, I say wherever people generally gather, any public place, theatres and stores and busses, and unless you by your verdict forever warn people like McKinney and his gang, unless you by your verdict here and now forever warn those who think like McKinney did and his gang that night, warn them they will pay with their own miserable misguided life if they attempt to defy and violate even the common decencies of mankind, not to say anything about the constitution of the United States of America, where free men and women have equal rights and they have equal rights regardless of color,—I am not saying there is a right for one kind and a right for the other, there is a right for both under the law of God and man, but both have to observe the right, both of them. I can cry and whine to you for rights but if I am not intellectual enough to understand and appreciate that you, too, have rights that I must respect then I am not entitled to those rights. That to me is a plain fact.

"Now, and while we are on that, in a lot of respects this is one of the most brutal affairs I have ever heard of and if McKinney and Williams, George and Tommy and John, and

Harris and Hardret were seeking rights, and that is the plan, they have been enforcing those rights, then they are not seeking equal rights, ladies and gentlemen, they seek exclusive rights and kill you in addition to that. Now, how long do you think free-born men and women can live under an intolerable situation like that, live in peace and quiet? You know the answer as well as I."

Counsel for defendant contends that such an argument was prejudicial to his rights because counsel for the state thereby injected into his argument hate stirring statements, and in other parts of his argument not quoted "went outside the record to incite prejudice, passion and class hatred," which it is contended was highly improper and not condoned; that it was the duty of the trial judge, which duty it is contended he did not discharge, to prevent such argument.

Further counsel for defendant contend that counsel for the state offered Harris, a defendant jointly indicted in the case we review, as a witness against defendant when he knew Harris was not telling the truth for the purpose of protecting himself, which testimony helped to convict defendant, and that defendant's "conviction secured by the use of perjured testimony, known to be such by the prosecuting attorney, is a denial of the 'due process of law,' White v. Ragen, 65 S. Ct. 978, 324 U. S. 760, 89 L. Ed. 1348."

It is observed that in the forepart of his closing argument the prosecuting attorney said:—

"This case is a peculiar case and in my treatment of this case I shall have to be so very, very careful because if I say the slightest word out of the way this constitution under which we live, which this defendant forgot and violated, that some constitution would come to his rescue and all we have done would come to naught; so that I must be careful."

In our opinion by such words counsel clearly indicated that he was not referring to the colored race in general but only to the colored defendant and his fellow indictees and group members, as likewise he was referring to them in the portion of his closing argument to which objection is made.

Further it is observed that neither counsel for defendant nor defendant himself made any objection and took no exception to such argument and in no manner called the attention of the trial judge thereto, which indicates to us that they did not at that time consider it prejudicial.

Certainly under the proper instructions given the jury by the trial judge as to the law applicable in the case we

review reasonable minds clearly and equally certainly could reach different conclusions as to the guilt or innocence of defendant of the crime of which the jury found him guilty, whose verdict in our opinion was not "contrary to the weight of the evidence" nor "to law."

Defendant, together with the others indicted, all participated in some overt act which caused Runk's death.

"Where such unlawful act does naturally and proximately result in death, all who participate in the commission of such unlawful act are in law liable for the commission of such unlawful killing." **Black v. State, 103 Oh St 434.**

Under the assigned ground of "other errors manifest on the face of the record in the trial of their cause" counsel for defendant claim that "while instructing the jury on first degree manslaughter the trial judge" failed to properly divide it and fully cover each division, and cites **State v. Carter, 75 Oh Ap 545, 58 N. E. (2d) 794.**

The trial judge correctly instructed the jury relative to the issues involved, and we find nothing therein prejudicial to the rights of the defendant. If counsel believed at the time the trial judge charged the jury that he did not fully instruct it in regard to the issues involved it was the duty of counsel for defendant to call the court's attention to the omission.

Counsel for defendant did not request the trial judge to give additional instructions and did not reserve a general exception to the charge. However even though he had it has been held:—

"* * * that a general exception to the charge is effectual only as to errors of law existing in the charge as given and does not bring in review an omission or failure to give further proper instructions. Furthermore, it is the duty of counsel to call the court's attention to any omission and make a request for further instructions. **Columbus Ry. Co. v. Ritter, 67 Oh St, 53, 65 N. E., 613; State v. McCoy, 88 Oh St, 447, 103 N. E., 136; Rucker v. State, 119 Oh St, 189, 162 N. E., 802; 2 O. Jur., 909."  State v. Laswell, 78 Oh Ap 202, 207.**

We find no error in this assignment as charged by counsel for defendant.

By brief counsel for defendant ask us the questions "Is the evidence sufficient to show that the defendant was involved in any way in the killing of Cyril Leroy Runk?" and "Is the

evidence legally sufficient to prove beyond a reasonable doubt, an intent to kill?" In support of their contention they argue that the conduct of counsel for the state in introducing into evidence one of several statements of Howard Harris taken by two detectives specializing in juvenile delinquency instead of other of his statements then unavailable was highly prejudicial to defendant; that the conduct of counsel for the state in offering Early was equally prejudicial because he was excited at the time of the fight and upon examination contradicted himself as to the complexion of defendant, and cite to us the law they believe applicable to support a negative answer to the second question. We find no error in this assignment as urged.

By assignment of error counsel for defendant claim that the trial judge erred to defendant's prejudice "in overruling his motion for a new trial, and in entering sentence of judgment upon the verdict."

"Sec. 13449-5 GC, provides:—

"No motion for a new trial shall be granted or verdict set aside, nor shall any judgment of conviction be reversed in any court in case of * * *; nor for the admission or rejection of any evidence offered against or for the accused unless it affirmatively appears on the record that the accused was or may have been prejudiced thereby; * * * nor for any other cause whatsoever unless it shall affirmatively appear from the record that the accused was prejudiced thereby or was prevented from having a fair trial."

In our opinion the trial judge did not err in overruling defendant's motion for a new trial and entering sentence of judgment upon the verdict.

Now counsel for defendant contend that all that was shown in the case at bar was a street fight—an affray, and that being "fully aware of the vicious, indicting newspaper articles that had been published regularly since Mr. Runk's death" in order to "protect the defendant the motion to acquit the defendant of first degree murder should have been sustained," and cites as authority 12 O. Jur 544, Section 530, where it is said:—

"If the state has closed its case, and the evidence, admitting it all to be true, does not tend to prove the essential elements of the crime, it is the duty of the court to take the case from the jury, and instruct them to bring in a verdict of not guilty."

Counsel for defendant also cite as authority **State v. Porello, 138 Oh St 239,** in which the supreme court affirmed the judgment of the court of appeals, which modified the judgment of the court of common pleas by reducing its judgment of conviction of murder in the first degree to manslaughter. We find no merit in this assigned ground of error. The judgment of the court of common pleas is affirmed.

JACKSON, PJ, NICHOLS, J, concur in judgment.