The STATE of Ohio, Appellant,

v.

FORD et al., Appellees.

[Cite as *State v. Ford* (1989), 64 Ohio App.3d 105.]

Court of Appeals of Ohio,
Licking County.

Nos. CA–3435, CA–3436.

Decided Sept. 15, 1989.

*Kenneth W. Oswalt,* Assistant Prosecuting Attorney, for appellant.
*Stephen B. Wilson,* for appellees.

MILLIGAN, Judge.

The Licking County Common Pleas Court granted defendants' motion to suppress all evidence found from the illegal search of their automobile. The state assigns a single error:

"Assignment of Error

"The trial court erred in granting the defendant-appellees' motion to suppress evidence taken from their vehicle since reasonable suspicion based upon articulable facts was present to justify the brief detention."

The following are the facts found by the trial court:

On January 12, 1989, at approximately 4:00 a.m., Licking County Sheriff Deputy Lenny Croghan pulled his cruiser behind an automobile stopped on the berm of State Route 16 near Pataskala, Ohio. Defendants were standing outside the automobile and its trunk lid was open. As Deputy Croghan neared, defendants shut the trunk lid and began to enter the automobile. Defendant Locke, on the driver's side of the automobile, then turned, retraced his steps toward the rear of the automobile and informed the deputy everything was fine. He told the deputy the two had gotten out of the car to get some cigarettes.

Deputy Croghan noticed in the rear seat of the automobile the top of a cardboard box with styrofoam packing, and at that point "felt something was wrong." He then ordered defendant Locke to get into the automobile and wait. Neither of the defendants was permitted to leave. When backup officers arrived at the scene, Deputy Croghan approached the vehicle a second time. This time he observed a scanner, flashlight, gloves and a hat in the front seat and the cardboard box with two crowbars in the rear seat. Defendants were subsequently taken into custody and arrested. The trial court made the following conclusions of law:

"1. There was a seizure when Defendants Locke and Ford were told to get back in their car and not permitted to leave after the initial conversation between Defendant Locke and Deputy Croghan. They were not free to leave. A reasonable person would not have felt free to leave. This is the standard established by the court in *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870 [64 L.Ed.2d 497] (1980) and *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319 [75 L.Ed.2d 229] (1983). Officer Croghan testified at the suppression hearing that had they attempted to leave, he would have stopped them.

"2. In the present case, the police lacked the grounds for a temporary seizure. In order to temporarily detain someone, the police must have a reasonable suspicion grounded on specific and articulable facts that the

person that they encounter was involved in or is wanted in connection with a completed felony. *United States v. Hensley,* 469 U.S. 221, 105 S.Ct. 675 [83 L.Ed.2d 604] (1985).

"3. An officer cannot act on a mere venture or exaggerated suspicion. *State v. Hill,* 52 Ohio App.2d 393, 6 Ohio Ops.3d 436 [370 N.E.2d 775] (1977). There must be reasonable suspicion that a person is involved in criminal activity before the officer can detain. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868 [20 L.Ed.2d 383].

"4. Defendants Locke and Ford were detained initially only on a hunch by Deputy Croghan that he 'felt something was wrong.' That hunch was based only on the fact that he saw a cardboard box with styrofoam packing in the rear seat of the automobile. There was no report of any break-ins received by the Deputy.

"5. At the time the Defendants were initially detained, their conduct was not such as would indicate any criminal behavior. There was not any 'specific misconduct' that would give rise to reasonable suspicion to merit a detention. *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637 [61 L.Ed.2d 357] (1979).

"6. A search and seizure isn't justified from what it ultimately produces. The officers' action must be justified from its inception. *Terry v. Ohio, supra.*

"7. There was nothing to indicate either Defendant had violated any law. A police officer has no authority to detain the driver of an automobile in order to check the driver's license and the registration of the vehicle once he had determined that the driver has not violated any law. *State v. Frye,* 21 Ohio App.3d 133 [21 OBR 141, 487 N.E.2d 580] (1985) and *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391 [59 L.Ed.2d 660] (1979).

"8. It is, therefore, the conclusion of the Court that reasonable suspicion was not present in the above case and the detention of Defendants Ford and Locke violated their rights under the Fourth Amendment of the United States Constitution.

"9. The Defendant's Motion to suppress is hereby sustained."

 The state's privilege to use evidence seized by law enforcement agents from the defendant's person or premises requires an affirmative showing by the state that the search and seizure was reasonable in the context of the Fourth Amendment. *State v. Perkins* (1985), 18 Ohio St.3d 193, 18 OBR 259, 480 N.E.2d 763. All searches without a valid warrant are presumed unreasonable and subject to the exclusionary rule unless shown by a preponderance of the evidence to be reasonable within the Fourth Amendment. *Lego v. Twomey* (1972), 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618;

*Athens v. Wolf* (1974), 38 Ohio St.2d 237, 239, 67 O.O.2d 317, 318, 313 N.E.2d 405, 407; *State v. Williams* (Dec. 9, 1988), Sandusky App. No. S–88–7, unreported, 1988 WL 131439.

Because the trial court found that the *Terry* "stop and frisk" rule was not satisfied, it excluded all evidence found in defendants' automobile as a fruit of the poisonous tree. Compare *Wong Sun v. United States* (1963), 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441; *Nardone v. United States* (1939), 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307; *Silverthorne Lumber Co. v. United States* (1920), 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319. See, also, *State v. Perkins,*[1] *supra,* 18 Ohio St.3d at 194, 18 OBR at 260, 480 N.E.2d at 765.

■ If law enforcement officers have a reasonable suspicion that a person is involved in criminal activity, they may briefly make an investigatory stop *sans* probable cause. *United States v. Hensley* (1985), 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604; *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. "In justifying a *Terry*-type intrusion, however, the police officer may not rely upon a mere hunch or an unparticularized suspicion." *State v. Price* (June 10, 1987), Montgomery App. No. 9760, unreported, 1987 WL 12645.

"[T]he police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry, supra,* at 21, 88 S.Ct. at 1880, 20 L.Ed.2d at 906. See, also, *Florida v. Royer* (1983), 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229, 236.

■ The totality of the circumstances surrounding the police officer at the time of the stop are determinative as to whether an investigative stop was justified. *United States v. Cortez* (1981), 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621; *State v. Freeman* (1980), 64 Ohio St.2d 291, 18 O.O.3d 472, 414 N.E.2d 1044; *State v. Mayle* (May 15, 1989), Stark App. No. CA–7670, unreported, 1989 WL 63714.

---

**1.** The exclusionary rule was first applied to Fourth Amendment violations in *Silverthorne Lumber Co. v. United States, supra,* in 1920.

In 1939, Justice Frankfurter first used the phrase "fruit of the poisonous tree" in *Nardone v. United States, supra.* The *Nardone* court denied the prosecution the right to evidence procured through illegal wiretapping. The Supreme Court held:

"To forbid the direct use of methods * * * but to put no curb on their full indirect use would only invite the very methods deemed 'inconsistent with ethical standards and destructive of personal liberty.'" *Id.* at 340, 60 S.Ct. at 267, 84 L.Ed.2d at 311.

It was not until 1963 that a five-to-four majority per Justice Brennan held that the exclusionary rule applied to Fifth Amendment violations in *Wong Sun v. United States, supra.*

■ Here, the trial court found that the officer did not possess a reasonable suspicion, only a hunch. Further, the officer's feeling that "something was wrong" rested only on his witness to the cardboard box with styrofoam packing in the rear seat of the automobile. There is no doubt that the trial court's manifest judgment that the officer lacked a reasonable suspicion of criminal activity is supported by the record. *State v. Williams* (1976), 47 Ohio App.2d 330, 1 O.O.3d 393, 354 N.E.2d 691; *State v. Davis* (1985), 27 Ohio App.3d 65, 27 OBR 84, 499 N.E.2d 1255 (a reviewing court will not substitute its judgment for that of the trial court when there is competent, credible evidence to support the trial court's judgment).

However, the finding of lack of reasonable suspicion does not end the analysis.

Here we find no error in the trial court's conclusion that the defendants were deprived of personal liberty and freedom in derogation of rights secured by the Fourth Amendment to the United States Constitution. In the language of the amendment, the state deprived the defendants of their right to be secure in their persons against unreasonable seizure. From that unconstitutional, illegal "seizure," numerous consequences, not relevant here, may flow.[2] Of concern here is the admissibility of subsequently discovered contraband possessed by the defendants in plain view in their automobile.

The United States Supreme Court long ago recognized that a mere finding that the state had violated the Fourth Amendment rights of a person was not sufficient to guarantee that the tyranny of government would not run roughshod over the privacy rights of its citizens. Thus was developed the "fruit of the poison tree" doctrine—the concept that evidence obtained as a result of the violation of a Fourth Amendment right would be inadmissible in criminal charges against such person.[3]

"The [exclusionary] rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." *Elkins v. United States* (1960), 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669, 1677.

■ Having elected to exclude evidence so obtained, legal scholars have

---

**2.** Discipline within the law enforcement community, civil liability under Section 1983, Title 42, U.S. Code, and potential criminal and civil remedies may avail.

**3.** The polestar decision, applying the concept to state criminal courts, is *Mapp v. Ohio* (1961), 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081.

long debated the reasons for the exclusionary rule.[4] By 1989 it has become clear that the *only* reason for the rule is that it is necessary to deter government against continued and future violations of Fourth Amendment rights of its citizens. See *Mapp v. Ohio, supra; Linkletter v. Walker* (1965), 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601, 33 O.O.2d 118; and more recently, *United States v. Leon* (1984), 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677.

In *Leon,* the Supreme Court adopted a balancing test as to applicability of the exclusionary rule—a policy decision to be made as to the costs vs. the benefits.

"As with any remedial device, the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served." *United States v. Leon, supra,* at 908, 104 S.Ct. at 3412–3413, 82 L.Ed.2d at 689, quoting *United States v. Calandra* (1974), 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561, 66 O.O.2d 320.

And so over the last several decades, the Supreme Court has limited the applicability of the exclusionary rule—although not often giving lip service to the "cost/benefit" analysis articulated in *Leon*—where, as a matter of policy, the costs (of allowing a guilty party to avoid criminal sanctions and damaging public confidence in the criminal justice system) were too high for the benefits (of deterring future government overreaching).[5]

In *Nix v. Williams* (1984), 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377, an additional limitation of the exclusionary rule was created: the inevitable discovery rule.

---

**4.** Scholars have identified several rationale that have influenced response to such issues: (1) a remedial purpose, to rectify the unconstitutional conduct; (2) the prophylactic purpose above; and (3) the "imperative of judicial integrity," *i.e.,* the system requires such a response to preserve its integrity.

The Supreme Court has consistently articulated the sole reason to be that it is a prophylactic deterrence to government intrusion into its citizens' protected rights. See *Elkins v. United States, supra.*

Rationale aside, much criticism "has been made of the Supreme Court's almost undignified haste to cloak detailed rules of evidence and police station procedure in the garb of constitutional doctrine." Judge Warren Burger, address delivered to the Ohio State Judicial Conference in Columbus, Ohio (Sept. 4, 1968), reprinted in 46 Ohio Bar 1434.

**5.** Examples include: (1) elimination of the "but for" concept as the test for "fruit of the forbidden tree," etc., see *Wong Sun, supra;* (2) adoption of an "attenuated connection" doctrine, *i.e.,* examine the connectedness between the act and the ultimate evidence, see *United States v. Ceccolini* (1978), 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268; (3) adoption of the "independent source" concept, *i.e.,* that government developed the evidence independently of the original illegal conduct, *State v. O'Bremski* (1967), 70 Wash.2d 425, 423 P.2d 530; see, also, *United States v. Friedland* (C.A.2, 1971), 441 F.2d 855; (4) adoption of the "inevitable discovery" rule, *i.e.,* the evidence would have been discovered anyway in the ordinary course of events, *Nix v. Williams, supra.*

"In *Nix*, the United States Supreme Court held that evidence obtained in violation of a constitutional right may be properly admitted at trial if it can be shown that such evidence would have ultimately or inevitably been discovered if no constitutional violation had taken place." *State v. Mosher* (1987), 37 Ohio App.3d 50, 53, 523 N.E.2d 527, 530.

The rule is the judiciary's acknowledgment of society's competing interest:

"[T]he 'inevitable discovery' test, 'if properly administered, serves well the *raison d'etre* of the exclusionary rule by denying to the government the use of evidence "come at by the exploitation of * * * illegality" and at the same time minimizes the opportunity for the defendant to receive an undeserved and socially undesirable bonanza.' "

4 La Fave, Search And Seizure (2 Ed. 1987) 381, Section 11.4(a).

■ The inevitable discovery rule does not require certitude. It only requires "that there be a very high degree of probability that the evidence in question would have been obtained independently of the tainted source." *People v. Payton* (1978), 45 N.Y.2d 300, 313, 408 N.Y.S.2d 395, 402, 380 N.E.2d 224, 231.

■ Reviewing the findings of fact by the trial court, we find there to be a very high degree of probability that the officer would have obtained the contraband *vis-a-vis* its plain view. Defendant Locke interjected himself into the officer's investigatory path diverting what would have logically resulted in the officer's ultimate discovery of the criminal tools on the seat of defendants' vehicle. "But for" the defendant Locke's movement to the back of the car, the officer would have observed the contraband in plain view. Thus, the officer would have had probable cause at that point to arrest and search the vehicle. *State v. Schmitz* (May 12, 1983), Cuyahoga App. No. 45512, unreported, 1983 WL 2996. The officer was suspicious at the outset which is evident by the court's finding that the cardboard box with the packing that the officer initially saw aroused his instinct that something was wrong.

■ The plain view rule established in *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564, and followed in *State v. Williams* (1978), 55 Ohio St.2d 82, 9 O.O.3d 81, 377 N.E.2d 1013, provides a three-pronged test:

1. the initial intrusion which afforded the authorities the plain view was lawful;

2. the discovery of the evidence was inadvertent; and

3. the incriminating nature of the evidence was immediately apparent.

All three prongs of the *Coolidge* test are satisfied here.

This fruit did not fall from a poisoned tree.

Further, our holding is consistent in the context of the *Janis* "balancing test" followed in *Leon, supra*. *United States v. Janis* (1976), 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046. The officer's effort to insure his safety by illegally detaining the defendants until backup arrived is so attenuated "that the deterrent effect of the exclusionary rule no longer justifies its cost." *United States v. Leon, supra*, 468 U.S. at 911, 104 S.Ct. at 3414, 82 L.Ed.2d at 691, quoting *Brown v. Illinois* (1975), 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416.

Based on the above, the state's sole assignment of error is sustained, and the judgment of the Licking County Common Pleas Court is reversed.

*Judgment reversed.*

PUTMAN, P.J., and JOHN R. HOFFMAN, J., concur.